IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM JOHN JOSEPH HOGE,

*Plaintiff*,

v.

WILLIAM M. SCHMALFELDT,

*Defendant*.

Civil Action No. ELH-14-1683

**MEMORANDUM OPINION**

On May 27, 2014, William John Joseph Hoge, plaintiff, filed suit against William M. Schmalfeldt, defendant, under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512. ECF 1. Both plaintiff and defendant are self-represented. Plaintiff has filed a motion for a preliminary injunction (the "Motion," ECF 13), dated June 12, 2014. On June 26, 2014, the Court held a hearing in open court on plaintiff's Motion. *See* ECF 26.[1] As reflected in the parties' submissions and arguments presented at the hearing, this suit is only the latest chapter in a nasty, ongoing feud between the parties, largely waged on the Internet, but which has found its way into federal court.

In response to plaintiff's original Complaint, ECF 1, defendant filed an answer, along with counterclaims against plaintiff and what defendant characterized as counterclaims against two other individuals: Chris Heather and an individual identified by the pseudonym "Paul

_____

[1] Subject matter jurisdiction is proper based on a "federal question," pursuant to 28 U.S.C. § 1338, which confers exclusive federal jurisdiction in copyright infringement suits. *See, e.g.*, *Tattoo Art, Inc. v. TAT Intern., LLC*, 794 F. Supp. 2d 634, 647 (E.D. Va. 2011).

Krendler." ECF 5.[2] Defendant subsequently amended his counterclaims and dismissed his counterclaim against Heather. ECF 8 (amended answer and counterclaims) at 7. The amended counterclaims allege "Malicious Prosecution and Abuse of Process"; "Defamation and Libel"; and "Harassment and Intentional Infliction of Emotional Distress." *See* ECF 8 at 5-13. Plaintiff has moved to dismiss defendant's counterclaims, for lack of jurisdiction and for failure to state a claim upon which relief may be granted. ECF 10.

On June 11, 2014, plaintiff filed an Amended Complaint ("Am. Compl.," ECF 9), containing 37 counts. Defendant has moved to dismiss the Amended Complaint. ECF 15. But, he also filed an answer to the Amended Complaint. ECF 18.

Although several motions are pending, this Memorandum Opinion will only address plaintiff's motion for a preliminary injunction. The Motion is supported by four exhibits. Defendant has filed an opposition ("Opposition" or "Opp.," ECF 19), with exhibits marked A through Z. Plaintiff has replied ("Reply," ECF 24), attaching one exhibit. And, at the hearing held on June 26, 2014, both parties introduced exhibits in support of their contentions. *See* ECF 27 (list of plaintiff's hearing exhibits) and ECF 28 (list of defendant's hearing exhibits).[3] For the reasons that follow, I will deny plaintiff's Motion.

### I. Background

#### A. Plaintiff's Allegations

Plaintiff, a "semi-retired engineer," alleges that he is the publisher of *Hogewash!*, an Internet website. Am. Compl. ¶ 7. Defendant is identified in the Amended Complaint as a

---

[2] Defendant also filed a motion seeking leave to conduct discovery to determine the actual identity of "Krendler." *See* ECF 6.

[3] I will refer to documents introduced as hearing exhibits by plaintiff as "Pla. Hrg. Exh. ____," and those introduced by defendant as "Def. Hrg. Exh. ___."

"retired writer who has published several different Internet websites and several books," *id.* ¶ 8, which consist in part of electronic-format "ebooks."  One of defendant's websites is found at patriot-ombudsman.com.  *Id.* ¶ 31.

The *Hogewash!* website is a blog, described by plaintiff as "the Internet equivalent of a newspaper column," in which he provides "a running commentary on subjects of interest to him."  Am. Compl. ¶ 9.  *See, e.g.*, *United States v. Cassidy*, 814 F. Supp. 2d 574, 576 (D. Md. 2011) ("A 'Blog' is a shorthand term for a 'web log,' i.e. a log or web page maintained on the World Wide Web.  A Blog is like a bulletin board and contains whatever material its sponsor decides to post.").  Readers of *Hogewash!* may submit comments that are posted on plaintiff's website.  Am. Compl. ¶ 10.  However, plaintiff "screen[s] all comments for suitability," and thus only a portion of the comments submitted by his readers appear on *Hogewash!*.  *Id.*  Plaintiff alleges:  "While the ownership of each comment remains with its author, the *Hogewash!* Terms of Service require that commenters grant Mr. Hoge a royalty-free license for the use of their comments as a part of his copyrighted work."  *Id.*  The *Hogewash!* Terms of Service state, in part, Pla. Hrg. Exh. 8 at 1:

> Any comment posted to the site remains the property of the originator of the comment who is solely responsible for the content of his comment.  Posting or attempting to post a comment to the site grants a royalty-free license to *Hogewash!* and its owner to reproduce the comment or any portion of it in any medium without limitation to the place or time of use or publication . . . .

Hoge also alleges that on April 30, 2014, he purchased from a pseudonymous writer, identified as "Paul Krendler," "the world book and ebook rights" to a particular blog post that had been published at the website thinkingmanszombie.wordpress.com.  Am. Compl. ¶ 11 (footnote omitted).

According to plaintiff, "[a]pplications for certificates of registration have been submitted to the Copyright Office by Mr. Hoge and 'Paul Krendler' for all works covered by the instant lawsuit in conformance with this Court's precedent." Am. Compl. ¶ 12.  At the hearing on the Motion, plaintiff offered an exhibit, introduced without objection, in support of his claim that he submitted copyright applications in June 2014 covering material posted on *Hogewash!* during March, April, and May of 2014, as well as the blog post that plaintiff purchased from "Krendler." *See* Pla. Hrg. Exh. 1.

Plaintiff's central allegation is that defendant has infringed plaintiff's copyrights because he "has repeatedly taken all or essentially all of complete blog posts written by Mr. Hoge and republished them without permission." Am. Compl. ¶ 13.  Publication has allegedly occurred "via books and ebooks, via various Internet websites operated by Defendant, and via the social media service Twitter." *Id.*

Count I of the Amended Complaint pertains to an ebook published by defendant on or about April 18, 2014, titled *My Slow, Journalistic Death*.  Am. Compl. ¶ 19.  Plaintiff alleges that Chapter 13 of that ebook contains a blog post that appeared on plaintiff's *Hogewash!* website on April 14, 2014.  *Id.* ¶¶ 18-19.  According to plaintiff, both the Amazon and Smashwords websites, where defendant allegedly sold *My Slow, Journalistic Death*, promptly removed the ebook from their catalogs at plaintiff's request.  *Id.* ¶ 20.  Specifically, Amazon removed the ebook on April 21, 2014, one day after receiving plaintiff's complaint; Smashwords removed the ebook on April 22, 2014, one day after plaintiff had advised it of the allegedly infringing content.  *Id.*

A copy of the ebook *My Slow, Journalistic Death*, which plaintiff appears to have printed for purposes of the hearing, was introduced as an exhibit.  Pla. Hrg. Exh. 3.  The exhibit indicates that Chapter 13 begins with approximately a dozen introductory lines, written by defendant.  *Id.* at 2.  The next portion is a brief post from *Hogewash!*, written by plaintiff, titled "Are You Pondering What I'm Pondering?," and which reads:  "Troz!  Brain . . . how do you have a useful conversation with someone who's written more books than he's read?"  *Id.*  Defendant then inserts three more sentences of his own commentary.  The subsequent portion consists of dozens of comments, also taken from *Hogewash!*, but which were written by various readers, in response to Hoge's "Are You Pondering What I'm Pondering?" posting.  *See id.* at 3-24.  Notably, several comments appear to quote brief Twitter messages written by defendant.  *See, e.g.*, *id.* at 7, 15, 16, 17, 18.  The end of Chapter 13 contains approximately two dozen lines of further commentary from defendant.  *Id.* at 24-25.  *See also* Pla. Hrg. Exh. 2 (copy of original "Are You Pondering What I'm Pondering?" posting from *Hogewash!*).

In Count II, plaintiff alleges that, on or about April 22, 2014, through Lulu, a print-to-order service, defendant sold a book titled "*Brain Dead*," which contained the same blog post referenced in Count I.  Am. Compl. ¶ 23.  Plaintiff asserts that, "[o]n information and belief," a third party made a complaint to Lulu on or about April 22, 2014, "concerning infringing material in *Brain Dead*."  *Id.* ¶ 24.   Upon receiving that complaint, Lulu removed *Brain Dead* from its catalog on April 22, 2014.  *Id.*

At the hearing, plaintiff displayed a hard copy of *Brain Dead* that he had purchased.  Plaintiff also introduced a photocopy of several pages from Chapter 13.  *See* Pla. Hrg. Exh. 4.  Like *My Slow, Journalistic Death*, Chapter 13 contains an introduction written by defendant,

followed by plaintiff's brief blog post and comments written by plaintiff's readers that were included on *Hogewash!*.  *See id.*

Count III relates to *Intentional Infliction*, a book that defendant allegedly made available online, on or about April 23, 2014, through Amazon's CreateSpace publishing service.  Am. Compl. ¶ 27.  The "bulk of the first chapter" of *Intentional Infliction* allegedly contains "a reproduction of approximately 80 percent of [a] blog post" for which plaintiff had purchased the "world book and ebook" rights" from the pseudonymous author, "Paul Krendler."  *See* Am. Compl. ¶ 11 (footnote omitted), ¶ 27.  After purchasing the rights from "Krendler" on April 30, 2014, plaintiff informed CreateSpace of the alleged copyright infringement that same day, and *Intentional Infliction* was removed from CreateSpace's catalog.  *See* Am. Compl. ¶¶ 11, 28.

Plaintiff's remaining claims fall into two groupings.  The first group, containing Counts IV through XXV, pertains to 22 allegedly infringing uses by defendant of plaintiff's copyrighted works on defendant's website, patriot-ombudsman.com.  *See* Am. Compl. ¶¶ 31-34.[4]  According to plaintiff, defendant incorporated plaintiff's works into defendant's own blog posts.  Am. Compl. ¶ 31.  Counts IV through XXV are listed in Table 1 of the Amended Complaint.  *See* Am. Compl. at 10-13.

The other group, consisting of Counts XXVI through XXXVII, pertains to "at least 12 infringing uses of Mr. Hoge's copyrighted works in messages sent [by defendant] via the social media service Twitter."  Am. Compl. ¶ 36; *see id.* ¶¶ 36-38.  According to plaintiff, although Twitter messages are limited to 140 characters, "Defendant included whole blog posts" belonging to plaintiff "by capturing them as images and embedding those images in" defendant's

---

[4] At the hearing on June 26, 2014, plaintiff agreed to withdraw Count IV of the Amended Complaint.  Accordingly, that count will be dismissed, pursuant to plaintiff's motion.

Twitter messages.  *Id.*  Counts XXVI through XXXVII are listed in Table 2 of the Amended Complaint.  *See* Am. Compl. at 14-16.

In the Amended Complaint, plaintiff seeks to recover damages from defendant based upon defendant's alleged "unauthorized reproduction, preparation of derivative works, distribution, and public display of Mr. Hoge's copyrighted works."  Am. Compl. ¶ 1.  Plaintiff asks the Court to (1) enter an order that defendant has violated plaintiff's rights under 17 U.S.C. § 101 *et seq.*; (2) "[p]ermanently ENJOIN defendant from further infringement of Mr. Hoge's copyrighted works"; (3) order defendant to "permanently delete any digital copies of Mr. Hoge's copyrighted works"; and (4) order defendant to pay damages, expenses, and costs, as specified in the Amended Complaint.  *See* Am. Compl. at 17 ("Prayer for Relief").  However, plaintiff advises that, "[b]ased on an economic cost/benefit analysis," he "has dropped all counts relating to items published before 1 March, 2014."  *Id.* ¶ 39.

As noted, defendant moved to dismiss the Amended Complaint.  ECF 15.  In his motion to dismiss, defendant argues, among other things, that plaintiff failed to register his copyrights in advance of filing suit, contrary to the requirement found in 17 U.S.C. § 411(a).  Defendant also invokes the protection of the "fair use doctrine."  ECF 15 at 12-15.  Further, defendant seeks to limit plaintiff's damages in the event plaintiff prevails, based on a lack of prior copyright registration.  *Id.* at 15-16.

### B. Preliminary Injunction Motion

In his preliminary injunction Motion, plaintiff asks this Court to enjoin defendant from violating plaintiff's copyrights, and to (1) order defendant to "remove all of Mr. Hoge's copyrighted materials from any Internet websites and social media accounts under his control";

(2) order defendant not to "sell, lend, give away, or otherwise distribute any books or ebooks containing Mr. Hoge's copyrighted material"; (3) order defendant not to "republish any further copyrighted material belonging to Mr. Hoge"; (4) order defendant not to "use image capturing in order to quote words presented in a text format as part of anything posted on the Internet"; and (5) order other relief that this Court deems just and proper.  Motion at 6-7.

In his Opposition, defendant asserts:  "Plaintiff has the audacity to ask this Court to make such an injunction on a unilateral basis while allowing Plaintiff to continue on unencumbered by the same rules he wishes to impose on the Defendant."  Opp. ¶ 2.  According to defendant (and as demonstrated by a review of his exhibits), plaintiff "also takes such images, sometimes complete or nearly complete articles from the Defendant's Twitter and blog posts to use on his 'Hogewash' blog without Defendant's permission."  *Id.  See also, e.g.*, Def. Hrg. Exh. 2B, 2D, 2F, and 2G (exhibits that, according to defendant, reflected plaintiff's use of material written by defendant).

Defendant asserts that, among the two dozen *Hogewash!* blog posts that plaintiff claims were subject to infringement, all but seven entries contain material from some *other* source.  Moreover, defendant insists that the "blog entries are so short and lacking in creativity that they would not be subject to copyright even if plaintiff had filed for copyright protection."  Opp. ¶ 3.  In support of that contention, defendant cites his Exhibits A through X, attached to his Opposition, *see* ECF 19-1, and introduced at the hearing.  *See* Def. Hrg. Exh. 2A - 2X.[5]  According to defendant, those exhibits contain materials that correspond to plaintiff's allegations in Counts IV through XXXVII of the Amended Complaint.  Defendant concedes that he has not

---

[5] All 26 of the exhibits attached to defendant's Opposition, labeled Exhibits A through Z, were introduced at the hearing, without objection, as defense Exhibits 2A through 2Z.

applied for copyright protection for his own blog or Twitter account, because he rejects "the whole idea of suing someone for using inconsequential snippets from another person's blog or Twitter account . . . ." Opp. ¶ 4.

Regarding a blog entry containing material that plaintiff says he purchased from "Paul Krendler," defendant argues that plaintiff must show that he signed a transfer agreement with "Krendler," pursuant to 17 U.S.C. § 204. Opp. ¶ 6a. In addition, defendant reiterates that plaintiff's claims "should fall on deaf ears" until plaintiff has "prove[n] his alleged copyright ownership." *Id.* ¶ 12. He maintains that plaintiff must provide evidence that he has filed applications with the U.S. Copyright Office for the material in defendant's books that plaintiff claims infringes his copyright, including defendant's book *My Slow, Journalistic Death*. *Id.* ¶ 6b. Likewise, defendant argues that plaintiff must "provide proof that he has filed an application with the [U.S.] Copyright Office for material" found in defendant's book *Brain Dead*, which defendant "personally pulled off the shelves at Lulu.com and never received a copyright takedown request over." *Id.* ¶ 6c. Defendant raises a similar argument in connection with defendant's book *Intentional Infliction*, asserting that plaintiff must "prove that he filed a proper application with the [U.S.] Copyright Office for the material prior to filing his DMCA takedown request and prior to launching his vexatious Copyright suit." *Id.* ¶ 6d.

In the Opposition, defendant also asserts that plaintiff has failed to make an adequate showing as to the elements necessary for a preliminary injunction. Among other arguments, defendant suggests that readers will not infer that defendant, rather than plaintiff, was the author of the material at issue. Opp. ¶ 11 (stating that "nobody will believe for a moment that I wrote the material"). Notably, as to plaintiff's likelihood of success on the merits, defendant asserts

that his use of plaintiff's material qualifies under the "fair use doctrine." *Id.* ¶ 13.  He also insists that he "currently has no plans to use material written by the Plaintiff," and suggests that, if he were to do so, he would provide "proper attribution." *Id.* ¶ 14.[6]  Further, defendant maintains that the balance of harms weighs against plaintiff, and characterizes plaintiff's suit as an effort to make defendant "abandon the principles of journalism." *Id.* ¶ 15.  Regarding the public interest aspect, defendant invokes First Amendment principles, and suggests that only plaintiff's interest, rather than the public's interest, weighs in favor of a preliminary injunction. *Id.* ¶ 16.

In his Reply, plaintiff argues, among other things, that defendant's Exhibits A through X (introduced at the hearing as Def. Hrg. Exh. 2A through 2X) "are not accurate reproductions of [plaintiff's] writings." Reply ¶ 3.  Plaintiff also asserts that he will face harm in the absence of a preliminary injunction, that defendant has continued to engage in behavior that plaintiff claims is unlawful, and that the "balance of harms" and "public interest" weigh in favor of a preliminary injunction. *See id.* ¶¶ 11-16.

At the hearing on June 26, 2014, plaintiff introduced the Terms of Service governing his *Hogewash!* Website, titled "The Fine Print." *See* Pla. Hrg. Exh. 8.  The Terms of Service state, in part, *id.* at 2:

> 4. Permission is granted to read, quote, cite, link to, print out, or otherwise use *Hogewash!* content under the following terms of use:
>
> A. All quotations from *Hogewash!* must include credit to *Hogewash!* or to W. J. J. Hoge and, wherever practicable, a hyperlink of the form http://www. hogewash.com/ to this site.

---

[6] At the hearing, plaintiff took issue with that claim, arguing that defendant continues to improperly use his copyrighted materials.

Although not directly relevant to the legal issue before the Court, I note that Hoge asserts in the Amended Complaint that, on June 14, 2013, he "was granted a peace order against Defendant because of harassment via the Internet," and adds that the peace order was extended for six months on December 9, 2013, "because of Defendant's continuing harassment."  Am. Compl. ¶ 8.  Schmalfeldt does not dispute that Hoge sought and obtained a peace order.  Rather, Schmalfeldt portrays the peace order as part of a pattern of harassment by Hoge, which allegedly "includ[ed] three hundred sixty seven (367) misdemeanor criminal charges filed against Schmalfeldt by Hoge in Carroll and Howard Counties."  *See* ECF 8 (amended counterclaim) ¶ 56.

Additional facts will be included in the Discussion.

## II.  Copyright Law Generally

Copyright protection applies to "original works of authorship fixed in any tangible medium of expression."  17 U.S.C. § 102.  The Fourth Circuit has explained the purpose of the Copyright Act, 17 U.S.C. § 101 *et seq.*, as follows, *Bond v. Blum*, 317 F.3d 385, 393 (4th Cir. 2003) (some modifications in original):

> The Copyright Act, enacted on the authority of Article I, § 8, of the Constitution, confers on creators of original works a limited monopoly in their works of authorship to advance an important public purpose.  "It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S. Ct. 774 [] (1984).  The reward to the owner is "a secondary consideration" that serves the primary public purpose of "induc[ing] release to the public of the products of [the author's or artist's] creative genius."  *Id.* (quoting *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 158, 68 S. Ct. 915 [] (1948)); *see also Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 546, 105 S. Ct. 2218 [] (1985).

Of relevance here, 17 U.S.C. § 501(b) states that the "legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b).

"Although copyright in an original work exists from the moment of creation, the author must comply with the statutory requirements of the Copyright Act to bring a suit for infringement." *Edgerton v. UPI Holdings, Inc.*, 2010 WL 2651304, at *5 (D. Md. July 1, 2010) (Blake, J.). "'[T]o establish copyright infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); *accord Metropolitan Regional Information Systems, Inc. v. American Home Realty Network, Inc.*, 888 F. Supp. 2d 691, 709 (D. Md. 2012), *aff'd*, 722 F.3d 591 (4th Cir. 2013).

In order to show ownership of a valid copyright, a plaintiff must supply "proof of originality and copyrightability." *See Darden v. Peters*, 488 F.3d 277, 285 (4th Cir. 2007) (internal quotation marks omitted). "A work is original when it has been 'independently created by the author (as opposed to copied from other works), and . . . possesses at least some minimal degree of creativity.'" *Edgerton*, 2010 WL 2651304, at *4 (quoting *Feist*, 499 U.S. at 345). The Supreme Court has said: "The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble, or obvious it might be." *Feist*, 499 U.S. at 345 (internal quotation marks omitted).

"The Copyright Act specifies that copyrights may extend to compilations and derivative works, but 'only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work . . . .'" *Edgerton*, 2010 WL 2651304, at *4 (quoting 17 U.S.C. § 103(b)). Regarding the originality of a compilation of facts, the *Feist* Court observed that "choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through copyright laws." *Feist*, 499 U.S. at 348.

Section 106 of the Copyright Act, 17 U.S.C. § 106(1)-(3), (5), grants to the owner of a copyright, *inter alia*, the following "[e]xclusive rights in copyrighted works":

> (1) to reproduce the copyrighted work in copies or phonorecords;

> (2) to prepare derivative works based upon the copyrighted work;

> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

> * * *

> (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly . . . .

The DMCA, which is codified in § 512 of the Copyright Act, is also pertinent. "The DMCA was enacted both to preserve copyright enforcement on the Internet and to provide immunity to service providers from copyright infringement liability for 'passive,' 'automatic' actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider." *ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (citing H.R. Conf. Rep. No. 105–796, at 72 (1998); H.R. Rep. No. 105–551(I), at 11 (1998)). "Section 512(c) codifies a detailed notice and takedown

procedure by which copyright holders inform service providers of infringing material accessible through their sites, and service providers then 'disable *access* to' such materials." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1018 (9th Cir. 2013) (citing 17 U.S.C. § 512(c)(1)(A)(iii), (c)(1)(C) & (c)(3)(A)(iii)) (emphasis added in *UMG Recordings*).

Regarding copyright registration, 17 U.S.C. § 411(a) states, in part:

> [N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title. In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute a civil action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights. The Register may, at his or her option, become a party to the action with respect to the issue of registrability of the copyright claim by entering an appearance within sixty days after such service, but the Register's failure to become a party shall not deprive the court of jurisdiction to determine that issue.

In 2010, the Supreme Court held that subject matter jurisdiction is not dependent upon registration of a copyright pursuant to § 411(a).  In *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 164-65 (2010), the Court said: "Federal district courts have subject-matter jurisdiction over copyright infringement actions based on 28 U.S.C. §§ 1331 and 1338.  But neither § 1331, which confers subject-matter jurisdiction over questions of federal law, nor § 1338(a), which is specific to copyright claims, conditions its jurisdictional grant on whether copyright holders have registered their works before suing for infringement."

*Reed Elsevier* overruled the approach taken by a number of lower courts, including the Fourth Circuit, that registration is a jurisdictional requirement.  *See Metropolitan Regional Information Systems*, 888 F. Supp. 2d at 705 ("the Fourth Circuit's treatment of registration as a 'jurisdictional prerequisite' to an infringement suit has been overruled") (quoting *Reed Elsevier*

and citing *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279 (4th Cir. 2003)). However, after *Reed Elsevier*, registration of a copyright remains a precondition to filing a copyright suit. *See* 559 U.S. at 157; *See, e.g.*, *Airframe Sys. Inc. v. L-3 Commn's Corp.*, 658 F.3d 100, 105 (1st Cir. 2011) ("Although the Supreme Court in *Reed Elsevier* [] recently held that the Copyright Act's registration requirement 'does not implicate the subject-matter jurisdiction of federal courts,' proof of registration of the allegedly infringed work remains an 'element[] of a cause of action' for copyright infringement.") (quoting *Reed Elsevier*, 559 U.S. at 161, 169). As discussed, *infra*, it remains a matter of dispute in this Circuit as to the proper interpretation of the registration requirement.

### III. Preliminary Injunction

#### A.  Legal Standard

As the Fourth Circuit observed in *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 188 (4th Cir. 2013), a preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." (Quotation marks and citation omitted.) The movant may obtain such extraordinary relief only on a clear showing of entitlement. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). Notably, a preliminary injunction is not appropriate "simply to prevent the possibility of some remote future injury." 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2948.1 (2d ed. 1995), at 154-55.

In order to obtain a preliminary injunction under Rule 65(a), the movant must satisfy all four factors articulated by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008): (1) that the movant is "likely to succeed on the merits," (2) that the

movant is "likely to suffer irreparable harm in the absence of preliminary relief," (3) that the "balance of equities tips in [the movant's] favor," and (4) that "an injunction is in the public interest."  *Accord Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part on remand*, *The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d 355 (4th Cir. 2010) (per curiam); *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).

Of relevance here, Section 502(a) of the Copyright Act expressly authorizes a court to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).  *See also, e.g.*, *Metropolitan Regional Information Systems, Inc. v. American Home Realty Network, Inc.*, 722 F.3d 591, 594 (4th Cir. 2013).

### B.  Factor One: Likelihood of Success on the Merits

As indicated, the first factor under *Winter*, 555 U.S. at 20, examines whether the party seeking the preliminary injunction is likely to succeed on the merits.  Here, several factors cast doubt on plaintiff's ability to prevail in this case, which I will address in turn.

### 1.  The Copyright Act's registration requirement

One threshold barrier to plaintiff's success on the merits is the copyright registration requirement, found in 17 U.S.C. § 411(a).  Here, plaintiff has alleged that "[a]pplications for certificates of registration have been submitted to the Copyright Office by Mr. Hoge and 'Paul Krendler' for all works covered by the instant lawsuit in conformance with this Court's

precedent." Am. Compl. ¶ 12.  Plaintiff does not argue that he has obtained a certificate of registration for the *Hogewash!* website or for any other material at issue.  Rather, plaintiff asserts that he has met the Copyright Act's registration requirement by submitting an application for copyright protection, and that he has offered sufficient evidence of that application.

In the recent case of *Caner v. Autry*, --- F. Supp. 2d ----, 2014 WL 2002835, at *11 (W.D. Va. May 14, 2014), Judge Moon wrote, *id.*:

> Although the United States Court of Appeals for the Fourth Circuit has yet to rule on the question, other circuits are divided about whether a litigant need only apply for a copyright and provide proof of that application before bringing suit in federal court (the "Application Approach"), or whether a litigant must provide proof of the U.S. Copyright Office's grant or denial of copyright registration before suit can be initiated (the "Registration Approach"). *Compare La Resolana Architects, PA v. Clay Realtors Angel Fire,* 416 F.3d 1195, 1202-04 (10th Cir. 2005) *with Cosmetic Ideas, Inc. v. IAC/Interactivecorp.,* 606 F.3d 612, 615-21 (9th Cir. 2010).  The United States Supreme Court has resolved that a court's jurisdiction does not hinge on this question. *See Reed Elsevier*[, 559 U.S. at 166] (holding that 17 U.S.C. § 411(a), which "imposes a precondition to filing a claim," "does not restrict a federal court's subject-matter jurisdiction.").

The *Caner* Court noted that the District of Maryland, as well as the Tenth and Eleventh Circuits, "have found that the U.S. Copyright Office's grant or denial of registration to a copyright claim is a precondition for suit."  2014 WL 2002835, at *12.  Judge Moon cited *Mays & Associates, Inc. v. Euler*, 370 F. Supp. 2d 362, 366 (D. Md. 2005), in which Judge Bennett concluded that actual registration of a copyright, rather than a mere application, is required to meet the registration requirement.  The *Mays* Court also noted that other judges in this District had declined specifically to adopt the view that the registration requirement is satisfied upon application for a copyright.  *See id*. at 367 (citing  *Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609 (D. Md. 2001); *Lowery's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737 (D. Md. 2003); *Glynn Interactive, Inc. v. iTelehealth, Inc.*, 2004 WL 439236 (D. Md. Mar. 9,

2004)); *see also Edgerton*, 2010 WL 2651304, at *5-7.  However, *Mays* was decided under pre-*Reed Elsevier* case law, which had held that the registration requirement was a jurisdictional one.

In *Edgerton v. UPI Holdings, Inc.*, 2010 WL 2651304, at *5-7, Judge Blake undertook a thorough analysis of the two competing interpretations of the registration requirement.  I cannot improve upon her analysis here, and certainly will not attempt to do so.  Upon reviewing relevant authorities, and observing that the issue of "whether the registration prerequisite is satisfied by application alone is a close question," Judge Blake declined to decide that issue for reasons particular to the case before her.  *See id.* at *7.

On at least one occasion, a court in this District has used language suggesting that it endorsed the "Application Approach," in which the submission of a copyright application is sufficient to pursue a claim of infringement.  *See Patrick Collins, Inc. v. Does 1-22*, 2011 WL 5439005, at *2 (D. Md. Nov. 8, 2011) ("Plaintiff has adequately stated a claim for copyright infringement even though its copyright registration is still pending.") (Williams, J.).  However, in a 2012 case involving the same plaintiff, Judge Williams—quoting at length from the reasoning in *Patrick Collins, Inc.*, 2011 WL 5439005, at *2—made clear that "the mere grant of subject matter jurisdiction should not be understood as an entitlement to statutory damages for infringement of an unregistered work." *Patrick Collins, Inc. v. Gillispie*, 2012 WL 440888, at *3 (D. Md. Feb. 9, 2012).  In the 2012 opinion, Judge Williams quoted *Tattoo Art*, 794 F. Supp. 2d at 657 (citations omitted), and said:

> "Although it is true that a plaintiff may recover actual damages for infringements that *occurred* prior to registration of the infringed work or works, such a recovery may not be *sought* by filing a lawsuit, let alone actually *recovered* in such a lawsuit, until the infringed works are registered or preregistered. 17 U.S.C. § 411(a). In other words, infringement prior to registration still constitutes infringement, and can still merit an *eventual* recovery, but such recovery cannot

be sought in a lawsuit until *after* registration or preregistration of the infringed works."

*Patrick Collins*, 2012 WL 440888, at *3 (quoting *Tattoo Art*, 794 F. Supp. 2d at 657); *see also Patrick Collins*, 2012 WL 440888, at *2 ("Mere application for a copyright does not qualify as either registration or preregistration under § 411(a).").

Even if an *application* for a copyright is sufficient to meet the registration requirement, it is not obvious that plaintiff has made an adequate showing. "A litigant may prove registration under th[e] Application Approach by showing 'payment of the required fee, deposit of the work in question, and receipt by the Copyright Office of a registration application.'" *Caner*, 2014 WL 2002835, at *13 (quoting *Apple Barrel Prods., Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386-87 (5th Cir. 1984)). In support of plaintiff's claim that he has submitted copyright applications covering all the materials at issue, he introduced at the hearing an exhibit purporting to be a printout depicting a U.S. Copyright Office website. *See* Pla. Hrg. Exh. 1 at 1. It is not a self-authenticating document, however. *See* Fed. R. Evid. 902.

In any event, the exhibit seems to reflect four copyright applications, all submitted in early June 2014. Three applications pertain to the *Hogewash!* website, which is classified on the U.S. Copyright Office website as a "Daily Newsletter[]," and cover the periods of March, April, and May 2014. *See id.*[7] The fourth application pertains to "We Can Write What We Want, Right?," which is classified as a "Literary Work." *See id.* Also included in the exhibit are two

---

[7] At the hearing, plaintiff claimed that he is entitled to pursue copyright claims in connection with material that was posted on *Hogewash!* and allegedly misused by defendant for a period of 90 days prior to plaintiff's June 2014 copyright application. Plaintiff cited 17 U.S.C. § 412 to support his position. For purposes of ruling on the Motion, I need not reach the merits of plaintiff's contention that his copyright application in June 2014 has retroactive force.

email messages that, according to plaintiff, reflect his payments of $240 and $55, made in connection with his copyright applications.  *See id.* at 2-3.

It is not entirely clear that the materials plaintiff introduced would satisfy the requirement articulated in *Caner*.  *See* 2014 WL 2002835, at *13.  It is also apparent that uncertainty exists as to whether a plaintiff's mere application for a copyright is sufficient, as a matter of law, to meet the statutory registration requirement found in Section 411(a).  Although I need not resolve this issue in order to rule on plaintiff's preliminary injunction Motion, the uncertainty is a consideration in assessing plaintiff's ability to prevail on the merits in this case.

2.  The *Hogewash!* Terms of Service

As indicated, at the hearing plaintiff introduced the Terms of Service governing his *Hogewash!* website.  Pla. Hrg. Exh. 8; *see supra* (quoting relevant provisions of Terms of Service).  Notably, defendant stated that he had also intended to introduce the Terms of Service as an exhibit, in support of his own position.  The relevant provision of the Terms of Service permits quotations from *Hogewash!*, so long as credit is given to *Hogewash!* or to Mr. Hoge and, "wherever practicable," a hyperlink to the *Hogewash!* website is provided.  *Id.* at 2.

This is not a case in which the defendant has sought to pass off a copyright holder's materials as his own.  Rather, where defendant has used materials from *Hogewash!*, he appears to have generally included attribution, in one form or another, to Hoge.  Nevertheless, defendant did not include a hyperlink to plaintiff's website, because—as defendant explained at the hearing—he did not want to increase visitor "traffic" to plaintiff's website.

To be sure, the parties disagree as to the meaning of the term "practicable."  And, uncertainty remains as to when the use of a hyperlink to the *Hogewash!* website is "practicable."

In any event, for purposes of the present Motion, it is apparent that defendant has a non-frivolous argument that his use of postings from *Hogewash!* complied with the website's Terms of Service.

Also pertinent is a portion of the Terms of Service that states as follows, Pla. Hrg. Exh. 8 at 1:

> Any comment posted to the site remains the property of the originator of the comment who is solely responsible for the content of his comment.  Posting or attempting to post a comment to the site grants a royalty-free license to *Hogewash!* and its owner to reproduce the comment or any portion of it in any medium without limitation to the place or time of use or publication . . . .

Assuming that provision is enforceable, it is not entirely clear under what circumstances plaintiff, as the owner of "royalty-free license[s]" but not of the comments themselves, can bring a copyright infringement claim based on alleged misappropriation of comments appearing on *Hogewash!* that were authored by third parties.  Significantly, several uses by defendant of plaintiff's material—including the uses at issue in Counts I and II—involve material from *Hogewash!* that largely consists of reader comments, which were not authored by plaintiff.

## 3.  Fair Use

Even assuming that plaintiff has met the applicable registration requirement and that no other barrier exists to a prima facie claim of infringement, defendant has a potential defense under the fair use doctrine.  "Fair use is a complete defense to a copyright claim, meaning that 'the fair use of a copyrighted work . . . is not an infringement of copyright.'"  *Caner*, 2014 WL 2002835, at *8 (quoting *Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 307-08 (4th Cir. 2010) ("*Bouchat IV*")).  *See also, e.g.*, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007) ("Even if a plaintiff satisfies [the] two requirements and makes a prima facie case

of direct infringement, the defendant may avoid liability if it can establish that its use of the images is a 'fair use' as set forth in 17 U.S.C. § 107.").[8]  A fair use defense "presents a mixed question of law and fact."  *Bouchat IV*, 619 F.3d at 307.

"In order to vindicate the . . . 'constitutional policy of promoting the progress of science and the useful arts'" underlying the Patent and Copyright Clause, Article I, Section 8 of the Constitution, "courts developed the doctrine of fair use, which fosters new creation and innovation by limiting the ability of writers and authors to control the use of their works." *Bouchat v. Baltimore Ravens Ltd. Partnership*, 737 F.3d 932, 936 (4th Cir. 2013) ("*Bouchat V*") (quoting *Harper & Row Publishers*, 471 U.S. at 549).   As the Fourth Circuit explained in *Bouchat V*, 737 F.3d at 937:

> The Copyright Act of 1976 codified the fair use doctrine for the first time, creating § 107 as a statutory exception to the typical protections provided to copyright holders in § 106. *Bouchat IV*, 619 F.3d at 307 (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576, 114 S. Ct. 1164 [] (1994)).  "Congress meant § 107 to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way and intended that courts continue the common-law tradition of fair use adjudication."  *Campbell*, 510 U.S. at 577, 114 S. Ct. 1164 (internal quotation marks omitted).  As a result, the fair use doctrine continues to serve as "an equitable rule of reason, for which no generally applicable definition is possible."  *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 202 (4th Cir. 1998) (internal quotation marks omitted).

> Nonetheless, Congress did provide a list of four factors that "guide the determination of whether a particular use is a fair use."  *Bouchat IV*, 619 F.3d at 308 (internal quotation marks omitted).  Those factors are:

>> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

---

[8] At the hearing on the Motion, plaintiff cited *Red Bull GmbH v. RLED, LLC*, 515 F. Supp. 2d 641 (M.D.N.C. 2007), in support of his contention that consideration of fair use was premature.  However, *Red Bull GmbH* is inapposite, as that case involved a motion to dismiss and not a motion for a preliminary injunction.  *See id.* at 647-48.

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  These factors cannot be treated in isolation from one another, but instead must be "weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578, 114 S. Ct. 1164.  This balancing necessitates a "case-by-case analysis" in any fair use inquiry.  *Id.* at 577, 114 S. Ct. 1164.  Our precedents have placed primary focus on the first factor.  *See Bouchat IV*, 619 F.3d at 308-11, 313-14; *Bond v. Blum*, 317 F.3d 385, 394-95 (4th Cir. 2003); *Sundeman*, 142 F.3d at 202-04.  A finding of fair use is a complete defense to an infringement claim: "the fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107.

In my view, the four factors contained in 17 U.S.C. § 107 suggest that defendant has a strong argument as to "fair use."  *See Metropolitan Regional Information Systems*, 888 F. Supp. 2d at 711 (in assessing whether a preliminary injunction is warranted in the copyright context, the existence of a viable defense diminishes a plaintiff's likelihood of success on the merits).  My analysis follows.

a. "[T]he purpose and character of the use"

Regarding the first fair-use factor, which pertains to "the purpose and character of the use," the Fourth Circuit has explained, *Bouchat V*, 737 F.3d at 939:

The first fair use factor focuses on "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."  17 U.S.C. § 107(1).  The preamble to § 107 lists examples of uses that are fair: "criticism, comment, news reporting, teaching . . . scholarship, or research."  *Id.* § 107.  These examples serve as a "guide[ ]" for analysis under the first factor.  *Campbell*, 510 U.S. at 578, 114 S. Ct. 1164.  The essential inquiry under the first factor can be separated into two parts: whether the new work is transformative, *see id.* at 579, 114 S. Ct. 1164, and the extent to

which the use serves a commercial purpose. *See Bouchat IV*, 619 F.3d at 310-11 . . . .

> "A 'transformative' use is one that 'employ[s] the quoted matter in a different manner or for a different purpose from the original,' thus transforming it." *A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630, 638 (4th Cir. 2009) (quoting Pierre N. Leval, Commentary, *Toward a Fair Use Standard,* 103 Harv. L.Rev. 1105, 1111 (1990)). Transformative works rarely violate copyright protections because "the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." *Campbell*, 510 U.S. at 579, 114 S. Ct. 1164. Importantly, a transformative use is one that "adds something new" to the original purpose of the copyrighted work. *Id.*; *Bouchat IV*, 619 F.3d at 314.

*See also Campbell*, 510 U.S. at 579 (describing a "transformative" use as one that "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message").

With respect to the "commercial purpose," the Supreme Court has cautioned against overemphasizing that aspect. In *Campbell*, 510 U.S. at 584 (internal quotation marks omitted), it said:

> If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities are generally conducted for profit in this country.

As noted, the materials at issue in this case include (1) blog posts from *Hogewash!* (Counts I and II) and the post by "Paul Krendler," for which plaintiff had acquired certain publication rights (Count III), which were incorporated into three books or ebooks that were briefly marketed by defendant and then withdrawn from sale; (2) material belonging to plaintiff that was incorporated on defendant's website, patriot-ombudsman.com; and (3) Twitter messages

sent by defendant that included plaintiff's materials, which were reproduced as images in defendant's messages.

It appears that both aspects of the first fair-use factor weigh in favor of a finding of fair use. Significantly, plaintiff conceded at the Motion hearing that defendant is "absolutely" entitled to respond to material found on *Hogewash!.* Plaintiff also acknowledged that defendant's use of quotations, amounting to one or two sentences found on *Hogewash!*, would be appropriate. But, plaintiff complains that defendant has improperly taken, "*in toto*," entire entries from plaintiff's *Hogewash!* website. As I see it, defendant has a viable claim that he used plaintiff's materials in a "transformative" manner and, arguably, for the purposes of "criticism, comment, [or] news reporting," as recognized in Section 107.

Exhibit B to plaintiff's Motion is illustrative. *See* ECF 13-2. That exhibit consists of a Twitter posting by defendant, which, according to plaintiff, "republishes" a comment found on plaintiff's *Hogewash!* website. Motion at 4 & n.4. Notably, however, the republished comment is brief, and defendant includes in his Twitter posting a response to that comment. In other words, defendant has taken one comment found on *Hogewash!* and included it in his own posting, in order to provide his own statement in response. In my view, even assuming that plaintiff has a valid copyright interest in the quoted material, defendant's use of that material, at least as reflected in Exhibit B, may well fall within the bounds of "fair use."

The same is true of an exhibit pertaining to Count V, which was attached to the Opposition and admitted into evidence at the hearing. *See* ECF 19-1 at 2 (Exhibit B); Def. Hrg. Exh. 2B. That exhibit depicts an online posting by defendant dated March 26, 2014, which quotes a prior blog entry by plaintiff, which itself quotes material lifted from *defendant's*

- 25 -

website.  *See id.*  No portion of that exhibit, written by either plaintiff or defendant, contains

original content of more than several sentences.  More generally, other exhibits attached to the

Opposition and introduced at the hearing appear to reflect an ongoing, generally nasty exchange

between the parties and, in some instances, other individuals who posted comments.  *See, e.g.*,

ECF 19-1 at 2-8 (corresponding to Def. Hrg. Exh. 2B-2H).

As for the "commercial purpose" aspect, it is far from clear how either party stands to

gain any meaningful commercial benefit through their publication and re-publication of the

materials that are the subject of this suit.  Although several books or ebooks were sold for a brief

time in April 2014, *see* Counts I through III, by all accounts any such sales were trivial.  It is not

commercial advantage, but rather personal animus, which appears to be the primary motivation

behind the parties' dissemination of the materials at issue.

b. "[T]he nature of the copyrighted work"

The second fair-use factor concerns "the nature of the copyrighted work."  17 U.S.C.

§ 107(2).  Here, as in *Bouchat V*, that factor does not weigh squarely in plaintiff's favor.  Even

assuming that the materials at issue are creative works, and thus "closer to the core of works

protected by the Copyright Act," *Bouchat IV*, 619 F.3d at 311, defendant's use of those

materials, which is arguably transformative, undermines the weight of this factor.  *See Bouchat

V*, 737 F.3d at 942-43.

c. "[T]he amount and substantiality of the portion used in relation to the copyrighted work as a whole"

The third fair-use factor is "the amount and substantiality of the portion used in relation

to the copyrighted work as a whole." 17 U.S.C. § 107(3).  *See also Bouchat IV*, 619 F.3d at 315

(reproducing a copyrighted work in full "militat[es] against a finding of fair use" but "does not

preclude" it) (citation omitted); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609-10 (2d Cir. 2006) ("The extent to which unlicensed material is used in the challenged work can be a factor in determining whether a . . . use of original materials has been sufficiently transformative to constitute fair use."); *Sundeman*, 142 F.3d at 205-06 ("'the extent of permissible copying varies with the purpose and character of the use'") (quoting *Campbell*, 510 U.S. at 586-87).

That factor does not weigh heavily in support of plaintiff's position.  Plaintiff does not claim that defendant has reproduced *all* of the content found on *Hogewash!* during the relevant time periods.  Although plaintiff alleges that defendant used some posts in their entirety, it is noteworthy that many of the entries reproduced by defendant were either relatively short or were presented along with commentary from defendant.  *See Bill Graham Archives*, 448 F.3d at 609-10.  To be sure, the blog posts and associated comments that defendant published in books or ebooks, *see* Counts I through III, appear to be somewhat lengthier than the materials implicated in other counts.  Of particular relevance to plaintiff's Motion, however, no such book or ebook has been offered for sale after April 2014.

### d. "[T]he effect of the use upon the potential market for or value of the copyrighted work"

The fourth fair-use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4).  A court is required to "determine whether the defendants' [use of the copyrighted item] would materially impair the marketability of the work and whether it would act as a market substitute for it." *Bond*, 317 F.3d at 396.  Of relevance here, "[a] transformative use renders market substitution less likely and market harm more difficult to infer." *Bouchat V*, 737 F.3d at 943.  In my view, as in *Bouchat V*, defendant's use of the material

at issue "is unlikely to supplant any market for the original," to the extent that any such market

exists. *See id.*

C. Factor Two:  Irreparable Harm

The second factor relevant to whether a preliminary injunction is warranted looks to

whether the moving party is "likely to suffer irreparable harm in the absence of preliminary

relief." *See Winter*, 555 U.S. at 20.  Regarding the irreparable harm element in the copyright

context, the district court explained in *Metropolitan Regional Information Systems*, 888 F. Supp.

2d at 712:

> "Irreparable injury often derives from the nature of copyright violations, which deprive the copyright holder of intangible exclusive rights." *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 544 (4th Cir. 2007); *see also Splitfish AG v. Bannco Corp.*, 727 F. Supp. 2d 461, 467 (E.D. Va. 2010) ("[A]llowing defendants to continue to distribute products containing plaintiffs' copyrighted work would 'deprive the copyright holder of intangible exclusive rights' to control the means and methods by which its work will be seen by the public.") (quoting *Christopher Phelps*, 492 F.3d at 544).  However, there is no presumption that copyright infringement creates irreparable harm.  *See, e.g.*, *Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.*, 452 F. App'x 351, 355 (4th Cir. 2011).  "Rather, courts evaluating requests for injunctive relief should consider evidence of irreparable harm based on the facts of a particular case." *EMI April Music, Inc. v. Garland Enters., LLC*, No. DKC 11-3352, 2012 WL 1986529, at *4 (D. Md. June 1, 2012).

Plaintiff does not face a risk of irreparable harm of the sort that compels the issuance of a

preliminary injunction.  As indicated, several of the works at issue, including all three books or

ebooks (*My Slow, Journalistic Death*; *Brain Dead*; and *Intentional Infliction*) that allegedly

contained blog posts belonging to plaintiff were quickly removed from the relevant online

catalogs after defendant first offered them for sale in April 2014.  And, in any event, defendant's

use of plaintiff's materials may ultimately be shown to qualify as "fair use."

Nor is it apparent how plaintiff would suffer *irreparable* harm.   In his Amended Complaint, plaintiff seeks monetary damages in connection with his copyright claims.   But, plaintiff has not identified any compelling reason as to why monetary damages would prove to be an insufficient remedy should plaintiff prevail on the merits of his claims.

At the hearing on the Motion, plaintiff relied on several cases that, in his view, established that infringement of a copyright raises a presumption of irreparable harm.   Notably, those out-of-circuit cases all predate the Supreme Court's 2008 decision in *Winter*.   And, to the extent those cases remain good law, each case involved substantial commercial harm of a markedly different character than the purported harm identified here.   *See Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240 (3d Cir. 1983); *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607 (7th Cir. 1982); *Wainwright Securities, Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91 (2d Cir. 1977).

<u>D.   Factors Three and Four:   the Balance of Equities and the Public Interest</u>

The third and fourth factors relevant to the issuance of a preliminary injunction look to whether the "balance of equities tips in [the movant's] favor," and whether an "injunction is in the public interest."   *Winter*, 555 U.S. at 20.   I am not persuaded that either factor points in favor of a preliminary injunction in this case.

As the Fourth Circuit explained in *Bouchat V*, 737 F.3d at 944, First Amendment concerns counsel against undue suppression of free discourse:

> While copyright law rewards the owner, "[t]he sole interest of the United States
> and the primary object in conferring the monopoly lie in the general benefits
> derived by the public from the labors of authors." *Sony Corp.*, 464 U.S. at 429,
> 104 S. Ct. 774 (internal quotation marks omitted).   As a result, Congress has
> attempted over the years to balance the importance of encouraging authors and
> inventors by granting them control over their work with "society's competing

interest in the free flow of ideas, information and commerce." *Id.* at 429, 104 S. Ct. 774.  Absent any protection for fair use, subsequent writers and artists would be unable to build and expand upon original works, frustrating the very aims of copyright policy.  *Campbell*, 510 U.S. at 575-76, 114 S. Ct. 1164. For creation itself is a cumulative process; those who come after will inevitably make some modest use of the good labors of those who came before . . . . After all, "it should not be forgotten that the Framers intended copyright itself to be the engine of free expression."  *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558, 105 S. Ct. 2218 [] (1985).

Fair use, then, is crucial to the exchange of opinions and ideas.  It protects filmmakers and documentarians from the inevitable chilling effects of allowing an artist too much control over the dissemination of his or her work for historical purposes. Copyright law has the potential to constrict speech, and fair use serves as a necessary "First Amendment safeguard []" against this danger. *Eldred v. Ashcroft*, 537 U.S. 186, 219, 123 S. Ct. 769 [] (2003). The case-by-case nature of the inquiry offers the advantage of flexibility, but it also lacks predictability and clarity, which is often an impediment to free expression.  As a result, fair use must give speakers some reasonable leeway at the margins.  As the Supreme Court has noted, the "considerable latitude for scholarship and comment" secured by the fair use doctrine protects the core value of free expression from excessive litigation and undue restriction.   *Id.* at 220, 123 S. Ct. 769 (internal quotation marks omitted); *see also id.* at 219, 123 S. Ct. 769.

To be sure, where a valid copyright exists and has been infringed, the public interest can weigh in favor of a preliminary injunction.   "'Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work.'"  *Metropolitan Regional Information Systems*, 888 F. Supp. 2d at 713 (quoting *Advance Magazine Publishers, Inc. v. Leach*, 466 F. Supp. 2d 628, 638 (D. Md. 2006)) (further citation omitted).  However, several significant barriers stand in the way of plaintiff's likelihood of success.  As a result, this is not an instance in which the public interest weighs in favor of a plaintiff pursuing a clearly meritorious copyright infringement claim.

Under the circumstances presented here, neither these final two factors, nor the other factors recognized by the Supreme Court in *Winter*, convince me that a preliminary injunction is appropriate.  Accordingly, plaintiff's Motion is denied.

### IV.  Conclusion

For the foregoing reasons, plaintiff's Motion (ECF 13) is denied.   And, pursuant to plaintiff's request, Count IV of the Amended Complaint is dismissed.  A separate Order follows, consistent with this Memorandum Opinion.


Date:   July 1, 2014                              _____/s/_____
                                                             Ellen Lipton Hollander
                                                             United States District Judge